## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DONZELL LOWE,<br><br>    *Plaintiff,*<br><br>    v.<br><br>TARRY WILLIAMS, *et al.*,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No.  16 C 8274<br><br>  Judge Virginia M. Kendall |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Donzell Lowe is an inmate within the Illinois Department of Corrections ("IDOC"). Lowe brings claims for injunctive relief (Count I) and compensatory damages (Count II) against multiple defendants stemming from their allegedly inadequate response to his need for medical treatment. (Dkt. 44). The Defendants include Wexford Health Services, Inc., Dina Page, and Alma Martija (collectively, the "Medical Defendants"), and Victor Calloway, Nicholas Lamb, Tarry Williams, John Baldwin, Terrence West, Ralph Burkybile, Russel McKay, Sheila Backstrom, Mahir Silmi, and Terra Kitchen (collectively, the "State Defendants"). Each of these Defendants has moved for summary judgment. (Dkts. 174, 178). For the following reasons, the Court grants in part and denies in part both motions. The Court grants summary judgment on Count I for the Medical Defendants but denies summary judgment for the State Defendants. The Court grants summary judgment on Count II for Martija, Wexford, Calloway, Lamb, Williams, and Baldwin, but denies

summary judgment for Page, West, Burkybile, McKay, Backstrom, Silmi, and Kitchen.

## BACKGROUND

### I. Lowe's Illness and Treatment

Plaintiff Donzell Lowe is an inmate at Stateville Correctional Center. (Dkt. 200 ¶ 6). He suffers from diabetes and hypertension. (*Id*. at ¶ 12; Dkt. 213 at ¶ 72).

Lowe states that, on April 15, 2015, Stateville shut off the heat to the facility Lowe was housed in, which he says is done annually when temperatures rise in the spring. (Dkt. 200 ¶ 25). The lack of heat was an issue for Lowe that year. (*Id*. at ¶ 8). In his cell house, there were broken windows, allowing cold air to enter, and Lowe's cell was in front of a door to the outside, which allowed in cold air when it was open. (Dkt. 213 ¶ 75).

Beginning on April 20, 2015, Lowe claims to have complained to correctional staff that it was very cold in his cell and the heat should be turned back on. (Dkt. 200 ¶ 26). He also requested blankets. The correctional staff allegedly responded that they could not turn the heat back on and that Lowe could not have any blankets, including Defendants Lieutenant West, Lieutenant Burkybile, Officer McKay, Officer Backstrom, Officer Silmi, and Sergeant Kitchen, though these staff members deny any such interaction. (*Id*. at ¶ 26; Dkt. 201 ¶¶ 6–11, 48–50, 53, 57–66, 70; Dkt. 205 ¶¶ 81–87 ). Lowe did not have any blankets in his cell at the time, though he did have a jacket. (Dkt. 179-1 at 52:21–53:11; Dkt. 213 ¶ 76). Lowe is a brittle diabetic,

meaning that it is more likely that cold temperatures could affect him. (Dkt. 213 ¶ 77; 200-2 at 101:4–102:8).[1]

Lowe alleges that, between April 20 and 23, 2015, he became sick and was vomiting in his cell. (Dkt. 200 ¶ 30; Dkt, 213 ¶ 78). He states that various correctional staff members saw him vomiting or he complained to them about vomiting and medical issues, including Defendants West, Burkybile, McKay, Backstrom, Silmi, and Kitchen, though these Defendants deny any such interaction. (Dkt. 200 ¶ 30; Dkt. 201 ¶¶ 6–11, 48–50, 53, 57–66, 70; Dkt. 205 ¶¶ 81–87). Several other inmates also state that they saw or heard Lowe vomiting. (Dkt. 44-2).

On April 20 and 21, 2015, Lowe went to the Healthcare Unit for his morning and evening insulin injections and a glucose-level check. (Dkt. 200 ¶¶ 24, 27–28). He would have walked to the Healthcare Unit to do so. (*Id*. at ¶ 24). On April 22, 2015, though Lowe went for his morning insulin and glucose check, he did not go in the evening. (*Id*. at ¶ 29).

On April 23, 2015, a nurse saw Lowe, and upon seeing his condition, called a medical technician. (*Id*. at ¶ 34; Dkt. 201 ¶ 17; Dkt. 179-1 at 57:1–57:12). While Lowe states that this medical technician brought him to the Healthcare Unit upon seeing him, records suggest that Lowe went to the Healthcare Unit for his Hypertension and Diabetes Clinic. (Dkt. 200 ¶ 34; Dkt. 179-1 at 57:1–57:12). At the

---

[1] The Medical Defendants argue that the cited deposition testimony would not be used to support this assertion. The stipulation, however, appears to have been that the deponent, Lowe's expert witness Nurse Melynda Litchfield, would testify only regarding Nurse Page, and no other defendants. The stipulation does not appear to have been that she could not comment on Lowe's condition. (Dkt. 200-2 at 162:14-166:24).

Healthcare Unit, Lowe was seen by then-Stateville Staff Physician Defendant Dr. Martija. (Dkt. 200 ¶¶ 8, 34–39; Dkt. 201 ¶ 18). Lowe told Dr. Martija that he was not feeling well and had not been eating for the last two days. (Dkt. 200 ¶ 34). Dr. Martija admitted Lowe into the infirmary for a 23-hour observation period, ordered that he be started on an IV, that his glucose be monitored, and that lab work be completed. (*Id.*). While in the infirmary, Lowe's condition improved, for example, his blood pressure lowered and his glucose level improved. (*Id.* at ¶ 39). But Dr. Martija referred Lowe, emergently, to the hospital. She stated she did so because he required more care than could be provided without neglecting other patients. (*Id.* at ¶ 38; Dkt. 179-3 at 108–09).

Later on April 23, 2015, Lowe was admitted to Presence St. Joseph Medical Center. (Dkt. 200 ¶ 40). Records show that the doctor's clinical impression was that Lowe was dehydrated, in diabetic ketosis, had an acute kidney injury, and had an NSTEMI (which the parties describe as a type of heart attack), and he was admitted to the ICU. (*Id.* at ¶ 40; Dkt. 179-10 at 1–3). The next day, Lowe underwent an angioplasty and stenting of the proximal right coronary artery. (Dkt. 200 ¶ 42; Dkt. 179-10 at 7). Lowe's discharge diagnoses were Non-ST elevation MI, coronary artery disease, diabetes mellitus, hypertension, and acute kidney injury. (Dkt. 179-10 at 7). He was discharged in stable condition back to Stateville on April 28, 2015, where he remained in the infirmary for a few days. (Dkt. 200 ¶¶ 42–44; Dkt. 179-10 at 7).

The following year, from October 28, 2016, to November 21, 2016, Lowe was seen at UIC and underwent a quadruple bypass surgery. (Dkt. 200 ¶ 69; Dkt. 179-1 at 75:4–75:10).

## II.    Lowe's Grievances

On May 8, 2015, Lowe filed a grievance. (Dkt. 200 ¶ 70). In it, he complained about the heat being shut off annually on April 15, noted that it had been very cold, and stated that he notified prison staff that he was unbearably cold. (*Id*. at ¶ 70; Dkt. 179-12 at 3–4). Lowe stated that by April 21, 2015, his condition had worsened, and he was shaking, but staff still refused to assist him, to turn on the heat, or to notify medical staff. (Dkt. 179-12 at 3–4). In his grievance, Lowe further recounted his progressing illness, including his vomiting, and recounted being taken by a medical technician to the Healthcare Unit. (*Id*.). He alleged that Dr. Obaisi, the medical director,[2] and Dr. Martija wanted to keep him in the infirmary, but that nurses objected and said they would file reports about his treatment if he was not taken to an outside hospital. (*Id*.). The relief Lowe requested was that the policy be changed so that the heat is regulated by the temperature outside, and also that "the Wexford contract be enforced in full so that the proper treatment is provided without cutting corners to save money." (*Id*.; Dkt. 44-3 at 2–4).[3] Lowe also named the various staff

---

[2] Though Dr. Obaisi was named as a defendant in this case, he was dismissed as a defendant after his death by agreement of the parties. (Dkt. 152; Dkt. 200 ¶ 5).

[3] With their motion for summary judgment, the Medical Defendants appear to have omitted the full version of the grievance. (*Compare* Dkt. 44-3 *with* Dkt. 179-12).

he interacted with while sick but noted that none helped him, including "Nurse Paige." (Dkt. 44-3 at 4–5).

On May 31, 2015, Lowe filed an additional grievance, stating: "Upon return from having being treated. . . I was informed that it was urgent that I follow up with cardiology in the time of two weeks." (Dkt. 44-3 at 10). He requested to be seen by a cardiologist. (*Id.*).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## DISCUSSION

Lowe brought suit based on the aforementioned events. In his Second Amended Complaint, Lowe alleged claims against multiple defendants (Dkt. 44),

however, the defendants remaining in this case are Wexford, Page, and Martija (the Medical Defendants), and Calloway, Lamb, Williams, Baldwin, West, Burkybile, McKay, Backstrom, Silmi, and Kitchen (the State Defendants). In Count I, Lowe seeks injunctive relief in the form of provision of an outside expert in treating diabetes and a heart condition, and provision of adequate long-term medical treatment for his diabetes, high blood pressure, and heart conditions. (*Id*. at 5–6). In Count II, Lowe seeks compensatory damages, alleging deliberate indifference to his serious medical needs and his disability. (*Id*. at 6).

## I.    The Medical Defendants

The Medical Defendants argue that summary judgment should be granted in their favor. Both Dr. Martija and Nurse Page were employees of Wexford at Stateville during the relevant period. (Dkt. 200 ¶¶ 7–9).

As to Nurse Page, who is a Licensed Practical Nurse (*id*. at ¶ 7), the Medical Defendants argue that Lowe failed to exhaust his administrative remedies against her. The Medical Defendants also state that there is no evidence to show she was aware that Lowe was ill, nor was it her responsibility to evaluate him. As to Dr. Martija, the Medical Defendants argue that she was not deliberately indifferent because upon becoming aware of his Lowe's condition, she immediately treated him and referred him to the emergency room, and there is no evidence that any of her treatment decisions were inappropriate. As to Wexford, the Medical Defendants argue that Lowe cannot state a claim pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), because he cannot show that Wexford has an

unconstitutional policy of not referring inmates for outside treatment. Finally, the Medical Defendants argue that there is no continuing violation of law meriting injunctive relief.

For an Eighth Amendment claim in the prisoner medical context, the Court performs "a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

"As its name implies, deliberate indifference requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation marks omitted). "[T]he evidence must show that the prison official acted with a sufficiently culpable state of mind, meaning the official knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* at 1030–31 (internal quotation marks omitted).

Two lines of precedent in this Circuit are relevant here. First, "when a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong." *Id.* at 1031. "If there is no direct evidence of knowing disregard, there must be at least enough evidence for a jury to draw an inference to that effect. Whether circumstantial or direct, the evidence must show that the physician was both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Wilson v. Wexford Health Sources, Inc*., 932 F.3d 513, 520 (7th Cir. 2019)

(internal quotation marks omitted). Second, "inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference," especially "if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe*, 947 F.3d at 1031 (internal quotation marks omitted). "Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730. "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31.

### A.    Lowe's Declaration

As a preliminary matter, with his response to the Medical Defendants' motion for summary judgment, Lowe submitted a declaration signed by him. (Dkt. 200-1). In it, he raises an additional theory of deliberate indifference—that Dr. Martija failed to send him for bypass surgery despite a need for it.

In the declaration, Lowe states that upon discharge from St. Joseph's Medical Center, "doctors at St. Joseph told me I should have bypass surgery within two weeks." (*Id.* at ¶ 5). He further states that he repeatedly asked doctors at Stateville, including Dr. Martija, to send him for bypass surgery, but his requests were repeatedly denied. (*Id.* at ¶ 6). Lowe states that in, October 2016, 18 months after the incident at issue, he finally had the quadruple bypass surgery. (*Id.* at ¶ 7). And Lowe states that "Doctors told me that the delay in the bypass surgery had resulted

in permanent damage to my kidneys." (*Id.* at ¶ 7). In the 18-month period of delay, Lowe says that his health deteriorated: "I lost the strength to play basketball and lift weights. I can no longer run, can only walk for short distances, and have severe shortness of breath. I did not have those problems before my heart attack. Even after my surgery, I do not have the strength to participate in physical activities. The damage to my body is permanent." (*Id.* at ¶ 9).

"It is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987). The Court will "balance the competing interests of determining whether a subsequent statement so clearly contradicts an earlier one so as to disallow it as a matter of law or whether it creates an issue of credibility more properly resolved by the trier of fact." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008). To the extent that Lowe's declaration contains conclusory allegations which contradict anything Lowe stated in discovery, the Court will disregard them. *But see McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) ("In contrast, when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." (internal quotation marks omitted)).

The Medical Defendants' other challenges, including that the declaration contains inadmissible hearsay and that any additional doctors should have been disclosed, are addressed as relevant below.

### B.    Nurse Page

First, the Medical Defendants argue that Lowe failed to exhaust his administrative remedies against Nurse Page, specifically by failing to name her in the grievance he filed.  As noted above, this is mistaken, and the Medical Defendants filed an incomplete version of the grievance.  The complete version filed by Lowe with his complaint shows that he named a "Nurse Paige" and stated that he spoke with her in the evening of April 23, but that she would not help him.  (Dkt. 44-3 at 4–5).

Next, the Medical Defendants argue that Lowe cannot show that Nurse Page had notice that he was sick in his cell.[4]  In their motion, they point out that Lowe did not, in his deposition testimony, make express allegations about Nurse Page.  (Dkt. 180 at 6–7).  Lowe uses the aforementioned declaration to clarify this—stating that Nurse Page saw him vomiting in his cell between April 20 and 23, 2015 while she was dispensing medication, and he told her he was sick and needed medical help.  (Dkt. 200-1 ¶ 3).

The Medical Defendants argue that the declaration contradicts Lowe's testimony and therefore must be disregarded.  This Court is not so sure of that.  While

---

[4] Notably, the Medical Defendants do not argue that Lowe was not suffering from an objectively serious medical condition, as to either Nurse Page or Dr. Martija.  "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention."  *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013).  There is evidence in the record that a lay inmate could tell that Lowe needed medical treatment, supporting the inference that the condition was objectively serious.  (Dkt. 44-2 at 4).  *See Palmer v. Franz*, 928 F.3d 560, 563–64 (7th Cir. 2019) (noting that an "'objectively serious medical condition is one that . . . is so obvious that even a lay person would perceive the need for a doctor's attention'" (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010))).  Additionally, Lowe was diagnosed as needing treatment, including a trip to the emergency room.

Lowe, in his testimony, did not name Nurse Page as seeing him, he did not say anything directly contradictory, such as that he did not see or speak with her. (*See, e.g.,* Dkt. 179-1 at 115:9–12 (alleging that Wexford nurses saw him vomiting)). While, as the Medical Defendants point out, Lowe did say that a medical technician, Bobby Nagpal, saw him vomiting, that does not necessarily mean that no one else saw him vomiting. (*See* Dkt. 213 ¶ 80 (arguing that Lowe stated only that Nagpal saw him vomiting)).

Additionally, there is other evidence in the record to support an inference that Nurse Page had notice of Lowe's condition. Though the Medical Defendants correctly point out that Lowe could not have interacted with Nurse Page in the evening of April 23 as he alleged in his grievance (because he was at St. Joseph at that time), there are other times during which he could have interacted with her. Lowe testified that he vomited repeatedly during the period in question, and affidavits of other inmates also state that they could see or hear Lowe vomiting.[5]  And there is evidence that Nurse Page may have come in contact with Lowe during this period. Medical records show that Nurse Page passed out medication to Lowe during the period he states he was sick. (Dkt. 179-8 at 60–61; *see also* Dkt. 179-6 at 9 (Medical Defendants' expert noting that the records reflect that Nurse Page passed medications to Lowe on April 20, 21, and 23)).  Nurse Page also noted in her deposition that, according to records,

---

[5] The Defendants take issue with these affidavits on the grounds that they contain hearsay or contradict other evidence. (*See, e.g.,* Dkt. 205 ¶¶ 88-93; Dkt. 213 ¶ 78). The Court does not resolve credibility disputes on summary judgment. *See Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020). And the inmates' statements about what they saw or that they heard Lowe vomiting are not hearsay, neither are their lay impressions of his condition.

she was passing out medication on April 23, 2015, and if she was passing out medication, she would have seen Lowe. (Dkt. 179-2 at 29–30). Though the records note that Lowe did not receive medication that day, she stated that she still might have passed it out. (*Id*. at 29). As such, a factfinder could reasonably find that, given the evidence, Lowe was openly sick, and Nurse Page saw him in this sickly state.

The Medical Defendants also argue that there is no evidence that Nurse Page was deliberately indifferent to Lowe's condition. They argue that Nurse Page's job was solely to hand out medication, not to treat patients, and she cannot be held liable for failing to take action outside of her job duties. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The Medical Defendants note, however, that her duties include contacting a medical technician if a situation requires attention. (Dkt. 180 at 11). Nurse Page herself admitted that: "If I saw someone sick in their cell I would call a med tech to come evaluate them." (Dkt. 179-2 at 18). Even more specifically, she stated that: "If I saw someone vomiting and they needed help I would call a med tech." (*Id*. at 30). The Medical Defendants' expert also stated that "calling for a Medical Technician for an inmate requiring urgent medical attention is within the standard of care." (Dkt. 179-6 at 14). The evidence here would allow a factfinder to reasonably determine that, by failing to call for a medical technician, Nurse Page departed from the appropriate standard of care and failed to take the action she knew to be appropriate in such a situation. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("Evidence of medical negligence is not enough to prove deliberate indifference, but evidence that a medical professional knew better than to

make the medical decision that he did is enough to survive summary judgment." (internal quotation marks omitted)). Moreover, ignoring a prisoner's request for medical assistance can be enough to show deliberate indifference. *See Petties*, 836 F.3d at 729 ("We have identified several circumstances that can be enough to show deliberate indifference. First, and most obvious, is a prison official's decision to ignore a request for medical assistance.").

Here, there is evidence that would allow a factfinder to determine that Nurse Page saw Lowe so sick in his cell that a layperson could tell he needed medical treatment, that she was one of the nurses he asked for help yet she did not assist him, despite knowing that was the appropriate course of action, leading him to continue suffering unnecessarily in a state of dehydration and acute kidney injury, among other diagnoses supported by the medical records. *Cf. Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007) (medical evidence that treatment relieved suffering can support inference that lack of treatment unnecessarily prolonged suffering). The Court therefore cannot determine that, as a matter of law, Nurse Page was not deliberately indifferent to Lowe's serious medical condition. The Court declines to grant summary judgment for Nurse Page on Count II.

To the extent Lowe argues that Nurse Page is liable for the delay in sending him for bypass surgery, she is entitled to summary judgment on such a theory. His affidavit states that he asked his doctors at Stateville to send him for bypass surgery, not Nurse Page. (Dkt. 200-1 ¶ 6). Lowe does not point to evidence that she had anything to do with the delay in sending him for this surgery.

### C. Dr. Martija

As the Medical Defendants point out, it is undisputed that Dr. Martija did not see Lowe until April 23, 2015, and when she did, she treated him and sent him to the emergency room. (Dkt. 200 ¶ 46). Lowe does not attempt to argue in his response that Dr. Martija acted with deliberate indifference once aware of his condition, *i.e.*, that she treated him improperly or delayed treating him. Instead, Lowe argues that Dr. Martija's constitutional violation comes from her failure to send him for bypass surgery, based on the facts of the declaration described above. There are significant problems with this argument.

Lowe's affidavit contains hearsay that is being offered for its truth, namely that doctors at St. Joseph told him he needed bypass surgery in two weeks and the general assertion that "Doctors told me that the delay in the bypass surgery had resulted in permanent damage to my kidneys." (Dkt. 200-1 ¶¶ 5, 7). As the Medical Defendants point out, these alleged doctors' statements are not party-admissions nor does the medical diagnosis hearsay exception apply. Fed. R. Evid. 801(d), 803(4); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) (noting that Federal Rule of Evidence 803(4) "excepts statements made by a person seeking medical attention to the person providing that attention. Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient."). Nor does Lowe point

to any records where such opinions are recorded.[6]  *See* Fed. R. Evid. 803(6).  As such, these doctor statements are inadmissible hearsay.

Additionally, even assuming Lowe needed bypass surgery and Dr. Martija delayed 18 months in sending him for this surgery, "where the plaintiff alleges the defendant delayed, rather than denied, medical treatment—[the Seventh Circuit has] required that the plaintiff present verifying medical evidence that the delay, and not the underlying condition, caused some harm."  *Walker*, 940 F.3d at 964 (internal quotation marks omitted).  All Lowe has presented is an oral statement from unknown doctors, which is inadmissible for the reasons just noted.  Lowe had the opportunity to get verifying medical evidence directly from these doctors or another expert, but he has not pointed to any such evidence.  And now would be too late to present such evidence—absent some extraordinary justification which Lowe has not provided, reopening discovery would unreasonably disrupt this case which has been going on for years.  (*See* Dkt. 146 (noting the length of discovery and the multiple extensions sought by the parties)).  *See also Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 (7th Cir. 2019) ("Parties who fall short on their disclosure obligations generally lose out on their expert evidence, as Rule 37(c) and plenty of caselaw make plain.").  Lowe, who has been represented by competent counsel for years, offered no reason justifying why this information and new theory of the case is being provided for the first time at this late stage.  Nor has Lowe pointed to any other medical

---

[6] The Medical Defendants have pointed out some references in the St. Joseph medical records of discussion of "eventual bypass surgery" and discussion of the option of "possibly bypass surgery."  (Dkt. 213-2 at 1, 4).  These records do not support  an imminent need for bypass surgery or a need for bypass surgery in two weeks.  The records also note that Lowe wanted to avoid bypass surgery.

evidence showing the delay in surgery caused him harm. *See, e.g., Williams*, 491 F.3d at 715–16 (noting that medical records that support an argument that the delay caused harm could also suffice to defeat summary judgment). Without such evidence, he cannot succeed on his claim against Dr. Martija. The Court therefore grants summary judgment in favor of Dr. Martija on Count II.

### D. Wexford

Lowe also seeks to hold Wexford liable. Lowe argues that Wexford should be liable for the acts or omissions of its employees, a respondeat superior theory. Under Seventh Circuit precedent, his argument is foreclosed: "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). This prevents vicarious liability of Wexford when one of its employees is found liable, let alone when no one employee is identified as liable, for example when liability might be diffused amongst many actors. *See Gaston v. Ghosh*, 920 F.3d 493, 497 (7th Cir. 2019) ("Vicarious liability makes a person responsible for someone else's wrong but does not change the proof required to show that a legal wrong has occurred. So even if we were to overrule *Iskander*, Gaston would need to show that *someone* whose acts are imputed to Wexford violated the Eighth Amendment. . . ."). This Court must apply that precedent, which has been reaffirmed by the Seventh Circuit recently. *See, e.g., Wilson*, 932 F.3d at 522 ("We recognize that in *Shields v. Illinois Dep't of Corrections*, Judge Hamilton called for a re-examination of *Iskander's* holding in an appropriate case, and he outlined why *Monell's* logic, developed for municipalities, may not apply

to private corporations. But we declined to hear Shields *en banc*, and since then we have chosen to leave *Iskander* undisturbed." (citations omitted)). This Court therefore declines to deny summary judgment on a theory of vicarious liability.

Wexford's liability could, however, be established by "demonstrating that a private corporation has a company policy or rule that is the 'moving force of the constitutional violation.'" *Id.* at 521 (quoting *Iskander*, 690 F.2d at 128). Assuming there was a constitutional violation here, the Medical Defendants assert that all Lowe can offer regarding an unconstitutional policy are conclusory assertions that Wexford does not like to pay to send inmates offsite (*see* Dkt. 200 at ¶ 49) and a statement from an unknown doctor commenting on purported Wexford policies and statements made by its employees. (*See* Dkt. 179-11). It is not clear how this document would be admissible (or even what it is or where it is from), and Lowe makes no argument to that effect. Nor has he pointed to evidence that any policy was the "moving force" behind the only possible constitutional violation at issue here, that of Nurse Page. *See, e.g., Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

Lowe's counsel notes that Lowe believes that a claim of systemic indifference to Stateville inmates should be advanced. Lowe's counsel, however, states that he has determined that there is insufficient evidence to advance such a claim, including insufficient evidence of an unconstitutional Wexford policy or custom. (Dkt. 202 at 11 n. 1).

On the eve of the due date for his responses to the motions for summary judgment, Lowe sought to have counsel withdraw and have new counsel appointed. (Dkts. 191, 194). This Court made clear that it would not appoint new counsel and that if Lowe wished for counsel to withdraw, he would have to respond to the motions for summary judgment himself. (*Id.*). *Cf. Cartwright v. Silver Cross Hosp.*, 962 F.3d 933, 937 (7th Cir. 2020) ("It's worth reemphasizing that the assistance of a pro bono lawyer in civil litigation is a privilege."). Lowe apparently chose to move forward with counsel representing him rather than raising these arguments himself, and the Court will accept the reasoned legal judgment of Lowe's experienced counsel, particularly in light of the dearth of evidence, as pointed out by the Medical Defendants. The Court therefore grants summary judgment for Wexford on Count II.

## II. The State Defendants

The State Defendants argue that they are entitled to summary judgment because they were not aware of or involved in Lowe's medical condition or care, nor can he establish that they disregarded a known risk to his health. There are two subsets of Defendants within this group, the administrator-level Defendants, and the correctional staff Defendants. The Court addresses these two groups separately.

### A. Administrator Defendants

During the relevant period, Defendant Baldwin was the Director of the IDOC, Defendant Williams was the Warden of Stateville, Defendant Calloway was the Assistant Warden of Programs at Stateville, and Defendant Lamb was the Assistant

Warden of Operations at Stateville. (Dkt. 201 ¶¶ 2–5, 23, 26, 27).[7] Lowe admits that he has never spoken with Baldwin or Lamb. (*Id*. at ¶¶ 22, 71). Baldwin and Williams do not recall receiving or reviewing relevant grievances made by Lowe, nor did they personally sign the relevant grievance documents—their designees did. (*Id*. at ¶¶ 33–39). Lowe testified that he is suing Calloway, Lamb, and Williams because they were wardens and he therefore assumes they must have had control over the heat. (*Id*. at ¶ 25; Dkt. 176-2 96:7–99:10). Lowe admits that he is not aware of Lamb or Williams having any involvement in his medical treatment. (Dkt. 201 ¶ 21). Lowe admits that Baldwin, Calloway, and Williams were not personally involved in or aware of the medical care Lowe received and never interfered with, delayed, or denied his medical care, nor are they aware of instances when Lowe was denied access to medical care. (*Id*. at ¶¶ 31–32).

As the State Defendants point out, "§ 1983 liability is premised on the wrongdoer's personal responsibility. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012) (internal quotation marks omitted). To be liable for the conduct of a subordinate, "the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (internal quotation marks omitted). The State Defendants argue that Defendants Baldwin, Calloway, Lamb, and Williams were not involved in Lowe's

---

[7] The State Defendants' cited evidence does not support the assertion as to Defendant Lamb, but Lowe does not dispute Lamb's position. (Dkt. 201 ¶ 3).

medical condition or medical care nor did they review his grievances.[8]  *See also Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ("To the contrary, there is evidence that Snyder does not review inmate correspondence relating to grievances; that task is delegated to subordinates.  Thus, Johnson has not shown that Snyder personally facilitated, approved, condoned, or turned a blind eye to Johnson's situation.").  Therefore, the State Defendants argue, Baldwin, Calloway, Lamb, and Williams are not liable and are entitled to summary judgment.

Lowe's counsel states that he has determined that, given the undisputed facts, the cases cited by the State Defendants, and Seventh Circuit precedent, he has no basis to defend against the motion for summary judgment for these four Defendants.  (Dkt. 203 at 2 n. 1).  Again, he notes that Lowe disagrees with counsel's determination.  As noted above, Lowe could have raised the arguments he wished to raise pro se but chose not to.  The Court will therefore accept counsel's concession, particularly in light of the caselaw cited above and by the State Defendants, and grant summary judgment for these four Defendants on Count II.

## B.    Correctional Staff Defendants

Lowe makes clear in his response to the motion for summary judgment that his concern is with his medical care, rather than his conditions of confinement.  "In

---

[8] For Lamb, the State Defendants have not pointed to evidence that his designee, rather than Lamb himself, signed the grievance.  But by the time the grievance got to Lamb, (and by the time it was written), the alleged constitutional deprivation that the grievance covered—failure to treat Lowe between April 20–23—had already occurred and been resolved.  There is no allegation that Lamb otherwise participated in this violation or had knowledge of Lowe's condition when it occurred.

order to survive summary judgment on a claim for deliberate indifference to serious medical needs, [Lowe] must show that he had an objectively serious medical need, and that named guards were deliberately indifferent to it." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

The correctional staff defendants argue that they lacked notice of Lowe's condition, do not recall interacting with him during the relevant period, or did not work on certain days during the relevant period. (Dkt. 201 ¶ 40–50, 57–58, 60, 62–63, 65). Lowe, however, testified that he interacted with each of these Defendants during the relevant period:

- Backstrom: Lowe testified that he told Backstrom that he needed a blanket and she responded there were none. (Dkt. 176-2 at 51:7–52:20, 104:6–105:6).

- Burkybile: Lowe testified that he spoke to Burkybile about "the heat and medical," and asked for blankets and for the heat to be turned on. Burkybile responded that he had no control over the heat and there were no blankets. (*Id*. at 51:7–52:20, 99:11–100:18).

- Kitchen: Lowe testified that Kitchen saw him vomiting, and he asked her directly if she could help him. She did nothing and told him there were no blankets. (*Id*. at 51:7–52:20, 101:17–103:14).

- McKay: Lowe testified that he told McKay he was vomiting, that he was cold, and needed blankets. McKay responded that he could not turn on the heat and could not give Lowe a blanket. (*Id*. at 51:7–52:20, 103:15–104:5),

- Silmi: Lowe testified that he asked Silmi for help, but he did not help Lowe. He asked Silmi for a blanket and told him he was vomiting. (*Id*. at 105:14–106:11).

- West: Lowe testified that he complained to West about the heat and asked for a blanket. West responded that he could not turn the heat back on and declined to give Lowe blankets. (*Id*. at 51:7–52:20).

"A prison officer is deliberately indifferent if he knows of and disregards an excessive risk to inmate health." *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (internal quotation marks omitted). As already described, there is evidence that Lowe was openly sick during the relevant period, namely, his own testimony and the affidavits of other inmates. And there is evidence, per Lowe's testimony, that he came in contact with each of these correctional staff members during the period he was openly and obviously sick, and therefore, they could have been aware of his condition. Whether his testimony is not credible, for example because he has imprecisely stated the dates he spoke with these Defendants, is a dispute not appropriate for resolution at the summary judgment stage. *See Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020). The State Defendants also point out that Lowe went to the Healthcare Unit for his insulin injections during the relevant period, that he saw nurses daily to receive his medication, and that he was seen by a medical technician at least once during the relevant period. To the extent that they point to this evidence to show that Lowe could not have been as sick as he alleges, that is a credibility issue not appropriate for resolution at the summary judgment

stage. To the extent they argue that they could fail to act because Lowe saw some medical staff, their cited cases do not support that proposition. Instead, the cases support the proposition that if prison officials refer a defendant to a medical provider or investigate whether a defendant is receiving treatment, they need not take further action.[9] Here, the State Defendants point to no evidence that the correctional staff checked whether Lowe was receiving care for his complained-of condition or that they referred him for such care.

As described above, the evidence supports an inference of a serious medical condition because lay inmates state that they could tell Lowe was sick and in need of treatment, and he was in fact sick enough for a trip to the emergency room. *See McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) ("A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention."). Given this evidence, it is not appropriate to grant the

---

[9] *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (noting that allegations were insufficient to state a deliberate indifference claim where prison official referred defendant to medical personnel who were treating him on a regular basis, but noting that "[n]on-medical defendants cannot simply ignore an inmate's plight"); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore Berry. . . . He consulted with the medical staff, forwarded Berry's concerns to the DOC, and timely responded to Berry's complaints. That he took no further action cannot be seen as deliberate indifference." (citations omitted)); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("Here, the non-medical officials responded readily and promptly to each of Hayes's letters and grievances. They contacted Medical Director Hamby and the administrator, requesting reports and summaries about the care that Hayes had received in order to ensure themselves that his complaints did not require further action."); *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006) ("Nevertheless, Curll did not disregard Johnson's complaints. He investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions. Curll is thus insulated from liability because he responded reasonably to Johnson's complaint." (citations and internal quotation marks omitted)); *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005) ("We do not think Miller's failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference.").

correctional staff Defendants summary judgment on the grounds that they lacked awareness of Lowe's objectively serious medical condition or had no involvement in the alleged constitutional violation.

The evidence also supports the reasonable inference that the correctional staff Defendants entirely disregarded that Lowe obviously needed medical help. There is evidence that they knew the appropriate action to take in such a situation would be to call for a medical technician, but there is no evidence that any of them did so or otherwise took any action at all to aid Lowe. (Dkt. 201 ¶¶ 51, 59, 61, 64, 66). And, for the same reasons as described above regarding Nurse Page, a factfinder could reasonably infer that the failure of these Defendants to seek any medical treatment for Lowe caused him hours or even days of additional pain for "no good reason," until a medical technician finally took him to the Healthcare Unit. *Williams*, 491 F.3d at 716 (medical evidence that treatment relieved suffering can support inference that lack of treatment unnecessarily prolonged suffering). The Court therefore denies the motion for summary judgment as to Count II for Defendants West, Burkybile, Backstrom, Silmi, Kitchen, and McKay.

## III. Injunctive Relief

In Count I of his Second Amended Complaint, Lowe also made a claim for injunctive relief. "[U]nder § 1983, declaratory or injunctive relief is only proper if there is a continuing violation of federal law." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 894 (7th Cir. 2012). Lowe's arguments in his responses to the motions for summary judgment pertain to the delay in treatment in April 2015, which was

rectified with a trip to the Healthcare Unit and then the emergency room, and the delay in getting bypass surgery, which he got in late 2016. As the Medical Defendants point out, he makes no argument pertaining to injunctive relief nor does he argue that there is an ongoing violation. *See, e.g., Crespo*, 824 F.3d at 674 (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *cf. Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). As such, the Court grants summary judgment for the Medical Defendants on Count I, Lowe's claim for injunctive relief.

The State Defendants, however, did not reference the injunctive relief claim alleged in Count I or argue why they are entitled to summary judgment on that Count. While it is possible that Lowe would likewise make no argument that he is entitled to injunctive relief against any State Defendant or otherwise describe any continuing violation, the Court declines to grant the State Defendants summary judgment on Count I sua sponte. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (noting that courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel" (internal quotation marks omitted)); *see also Crespo*, 824 F.3d at 674 (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). The Court will allow the State Defendants to move for

summary judgment on Count I, making any relevant arguments.  Should they wish to do so, they should file such a motion within 21 days of the filing of this Opinion.

## **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the Medical Defendants' motion for summary judgment.  (Dkt. 178).  The Court grants summary judgment for the Medical Defendants on Count I, grants summary judgment for Dr. Martija and Wexford on Count II, and denies summary judgment for Nurse Page on Count II.  The Court grants in part and denies in part the State Defendants' motion for summary judgment.  (Dkt. 174).  The Court grants summary judgment for Defendants Calloway, Lamb, Williams, and Baldwin on Count II.  The Court denies summary judgment for Defendants West, Burkybile, Backstrom, Silmi, Kitchen, and McKay on Count II.  The Court denies summary judgment for the State Defendants on Count I because they failed to make any argument pertaining to this Count.  The State Defendants may file a motion for summary judgment on Count I within 21 days of the filing of this Opinion.

Virginia M.  Kendall
United States District Judge

Date: October 1, 2020